**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

KEN GASKINS, et al.,                                              Case No. 1:12-cv-192

          Plaintiffs,                                                   Dlott, J.
                                                                              Bowman, M.J.

    v.

ROCKTENN COMPANY,

          Defendant.


**REPORT AND RECOMMENDATION**

Plaintiffs Ken Gaskins and James Lang filed this action against their former employer, RockTenn Company ("RockTenn"), alleging that Defendant has discriminated against both Plaintiffs on the basis of their age, in violation of both state and federal law. (Doc. 10, Amended Complaint, Counts I, V).   In addition, Plaintiff Gaskins alleges that Defendant terminated him in retaliation for Plaintiff's action in filing a workers' compensation claim (Count IV).   Last, Plaintiff Lang alleges that he was terminated either in response to his use of the Defendant's self-insured medical benefits (or planned use of the same), and/or in response to his use, or planned use, of intermittent and open-ended leave under the Family Medical Leave Act.  (Counts II, III).  The latter two theories allege claims under §510 of ERISA, and under the FMLA.

Defendant has filed a motion for summary judgment, which has been referred to the undersigned for initial consideration and a Report and Recommendation.  Plaintiff has filed a response,[1] and Defendant, a reply.   Defendant also has filed Proposed

---

[1]Finding the issues to be adequately briefed, the Court will deny Plaintiff's request for oral argument.

Undisputed Facts, to which Plaintiff has responded.  For the reasons that follow, Defendant's motion for summary judgment should be granted.

## I. Background[2]

Defendant RockTenn manufactures corrugated cardboard.  Delays in the shipping department can slow Defendant's entire manufacturing process.  One type of shipping delay that can occur is when records reveal a mistake in a truck's load, requiring shipping department employees to determine the source of the error by inspecting the load.

In 2008, Plaintiffs were hired by RockTenn's predecessor, Smurfit-Stone, to work as non-union Shipping/Receiving Coordinators at its Cincinnati-Blue Ash, Ohio plant. Plaintiff Gaskins was 44 years old at the time of his hire; Plaintiff Lang was 46 when hired.  Gaskins worked on the first shirt; Lang worked on the third shift.  In their respective "Coordinator" positions, Plaintiffs oversaw loading and documentation by hourly employees, although Plaintiffs deny actual supervisory authority over those union employees.  The performance reviews of both Plaintiffs were satisfactory or better.

Because it had a high rate of safety occurrences, the Blue Ash facility was a "safety focus plant," with corporate oversight for safety reporting and training.  In 2009, the Blue Ash Plant Manager was fired for a safety violation.  Both Plaintiffs attended safety meetings and understood their responsibility to work in a safe manner.  However, both Plaintiffs are alleged to have committed safety violations on September 7, 2011. On September 16, 2011, Defendant informed both that they were being terminated as a result of their respective violations.

---

[2]This factual summary is adopted from the parties' proposed undisputed facts (Docs. 26, 27, 29). To the extent that disputes exist, and for purposes of the pending motion, all facts have been construed in Plaintiffs' favor.

In May 2011, RockTenn acquired Smurfit-Stone, including the Blue Ash facility. RockTenn was self-insured for both workers' compensation and for health insurance benefits. After the acquisition, Plaintiffs' pay, benefits, supervisors and job duties remained unchanged.

During Lang's tenure at the Blue Ash facility, his supervisors and management at RockTenn became aware that he had two children with cystic fibrosis.  In fact, the facility held fundraisers for them.  Over time, Lang's older daughter's condition deteriorated to the point that she required a double-lung transplant.  In October 2010, Lang applied for intermittent FMLA leave in anticipation of having to take leave on a moment's notice, based upon his daughter being placed on a transplant list.  RockTenn approved Lang's FMLA request, although Lang never actually took leave.

By November 2010, Lang's family had been paid the $1.5 million lifetime maximum of health insurance benefits under the company's policy.  However, no one at the Blue Ash facility, or even in the company's Georgia Benefits office, was aware of that information, since the administration of health care was delegated to a third party insurance company.  (Doc. 24, Poole Depo. at 21).  The lifetime maximum was eliminated and new benefits were instituted in January 2011, pursuant to the Affordable Care Act.

Health care costs were factored into the facility's budget, with Defendant paying $185-190 million dollars per year in health care costs, with 19,000 employees in self-insured plans, at an average of $9,700 per year per employee. (Doc. 24, Poole at 16). Lang estimates that his daughter's double lung transplant had the potential to cost Defendant more than $2 million.  However, management at Defendant's facilities had no

3

knowledge of individual employee costs, except that they were provided information concerning the premium cost of each employee's chosen insurance plan. (*Id*.).

In February 2011, Lang sent an email confirming his anticipated need for future FMLA leave, and explaining that the timing of the leave was unpredictable due to the way that the transplant list works. Lang expressed hope that a transplant would occur during the summer of 2011. No RockTenn manager or benefits representative ever made any negative comments about Lang's request for leave. However, Plaintiff's supervisors, particularly Shipping Supervisor Tom Johnson and Plant Supervisor Marty Wilp, asked frequently about his anticipated leave. Lang never did take FMLA leave while at RockTenn. Instead, his daughter did not receive a transplant until 2013, some seventeen months after Plaintiff's termination.[3]

**Lang's Alleged Safety Violation**

In the early morning of September 7, 2011, Plaintiff Lang asked an hourly worker to move a forklift so that Lang could step up onto it to inspect a load. (Doc. 14, Lang Depo. at 50). After the forklift was put in place,[4] Lang climbed on top of the forks, which were several feet off the ground, in order to look into the back of a trailer to check the load. Superintendent Marty Wilp saw Lang on the fork lift and immediately reported the incident to Safety Manager Micah Birchfield. Plaintiff testified that Wilp told him at the time that he should have placed a pallet on the forks before climbing onto the forks directly. Lang completed his shift and returned to work for part of the next day, until he was called to a meeting and suspended, pending further investigation, by Plant

---

[3]Sadly, although Plaintiff's daughter ultimately received a double lung transplant on February 11, 2013, she died from complications of cystic fibrosis on March 8, 2013. As one component of damages, Lang claims $15,000 in life insurance proceeds based upon a policy maintained through his employment with Defendant, which policy lapsed prior to his daughter's death when Plaintiff was terminated.

[4]Lang notes a disputed issue concerning whether the forklift was moving, but for purposes of the pending motion, that factual dispute is resolved in Plaintiff's favor.

4

Manager Kelly Doherty and Mr. Birchfield after being questioned about the incident. After the meeting, Plant Manager Doherty conferred with Area Human Resources Manager Katherine Yoder-Baert, and they recommended to Business Unit General Manager Pat DeJulia that Lang be terminated.  Mr. DeJulia agreed. On September 16, 2011, Doherty called Lang and advised him that he was being terminated for the safety violation.

**Gaskins's Alleged Safety Violation**

During a later shift on September 7, Plaintiff Gaskins climbed on a trailer bumper approximately 40 inches off the ground, and stepped into the space between the end of the full load and the end of the trailer.  The trailer was in the yard, and it was raining. Gaskins testified that the load was double-stacked so there was no easy step-up.  He testified that he had sufficient room to step into the truck, although the space was small, in his estimate, 20 inches.  (Doc. 13, Gaskins Depo. at 33).  Gaskins lost his footing and fell backwards into the door, and then fell further to the ground.  He called Safety Manager Birchfield, who took him to the hospital where he was treated for a fractured wrist.  RockTenn did not contest Plaintiff Gaskin's workers' compensation claim.

The day following the incident, Plant Manager Doherty and Mr. Birchfield met with Gaskins to analyze the root cause of the incident.  They informed Gaskins of their view that he had taken a shortcut, explaining that he should have brought the truck back to the dock to check the load.  They told Gaskins that he would be suspended for one week.  Doherty subsequently conferred with HR Manager Yoder-Baert, and the two again recommended to DeJulia that Gaskins be terminated.  DeJulia again agreed with that recommendation.  On September 16, 2011, Plant Manager Doherty also called Gaskins and told him he was being terminated for his safety violation.

Neither Plaintiff was replaced by a new employee. Instead, Shipping Supervisor Tom Johnson and Superintendent Wilp assumed Plaintiffs' responsibilities. Plaintiff Gaskins was 47 at the time of his termination, while Plaintiff Lang was 49 years old when terminated.

## II. Analysis

### A. Summary Judgment Standard

In a motion for summary judgment, a court "must view the facts and any inferences that can be drawn from those facts ... in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising,* 477 F.3d 881, 886 (6th Cir. 2007) (internal quotation marks omitted). "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed.R.Civ.P. 56(c))(internal quotation marks omitted). "Weighing of the evidence or making credibility determinations are prohibited at summary judgment-rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.* However, summary judgment will be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### B. Defendant's Motion

Both Plaintiffs allege that Defendant has discriminated against them based on their age. In addition, Plaintiff Gaskins alleges that Defendant unlawfully retaliated against him by firing him in response to his filing a workers' compensation claim.

6

Plaintiff Lang similarly brings a separate claim in which he alleges that he was terminated in response to the potential health insurance benefits that his family would receive if he continued his employment, and/or the medical leave that he planned to take, if his daughter received a double-lung transplant.

Defendant first argues that neither Plaintiff can make out a prima facie case of age discrimination.  Defendant further contends that Gaskins cannot show workers' compensation retaliation, and that Lang cannot show ERISA interference or retaliation, or a violation of the Family Medical Leave Act ("FMLA").  In the alternative, Defendant argues that, even if either Plaintiff can prove a prima facie case on any of his claims, Defendant has articulated legitimate reason for termination – each Plaintiff's safety violation.  If either Plaintiff establishes a prima facie case on any of his claims, the burden of production shifts to the employer to put forth a "legitimate, nondiscriminatory reason" for the adverse action taken. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 246, 253 (1981).  If the employer meets that burden, then "the presumption of discrimination [or retaliation] created by the prima facie case falls away…and the plaintiff then needs to show that the defendant's 'legitimate nondiscriminatory reason' was a 'pretext for discrimination.'" *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706-707 (6th Cir. 2006)(citing *DiCarlo v. Potter*, 358 F.3d 408, 414-15 (6th Cir. 2004)(additional citations omitted)).  The Court will first address Defendant's argument that neither Plaintiff can establish a prima facie case on any of his claims, before turning to Defendant's argument that neither can overcome Defendant's articulated legitimate reasons for the termination decisions.

### 1. Failure to Prove A Prima Facie Case

#### a. Prima Facie Case of Age Discrimination

The Age Discrimination in Employment Act ("ADEA") and Ohio law both prohibit an employer from discharging an employee because of his age. 29 U.S.C. §623(a)(1); Ohio Rev. Code §4112.02. In order to prove their age discrimination claims, Plaintiffs bear the burden of showing that "age was the 'but for' cause" of their respective terminations. *Blizzard v. Marion Tech. College*, 698 F.3d 275, 283 (6th Cir. 2012)(citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)).

Because Plaintiffs have no direct evidence of age discrimination, the familiar *McDonnell Douglas* burden-shifting framework applies to Plaintiffs' claims. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Blizzard v. Marion Tech. College*, 698 F.3d at 283. Under that framework, a plaintiff must prove: "(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination." *Id.* (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002)). In this case, Defendant concedes the first three elements of Plaintiffs' age discrimination claims, insofar as each Plaintiff was over the age of 40, qualified for their positions, and terminated. However, Defendant argues that neither Plaintiff can show any circumstance that would support an inference of age discrimination.

First, Defendant notes that it is uncontested that Plaintiffs were not replaced by a younger employee – or indeed, by anyone at all. Second, Defendant points out that this is not a case where younger managers fired older employees. Defendant also points to the fact that two of the three decision makers were over the age of 40, and that the third (Doherty) was 39 years of age.

The undersigned agrees that, on the record presented, Plaintiffs have failed to establish a prima facie case of age discrimination.  Although Plaintiffs both testified to their belief that RockTenn hires younger employees and fires older ones, there is no evidence to support a disparate impact claim, nor have they offered any evidence at all of age discrimination.  Both admitted in deposition that they lacked evidence to support their beliefs.  (Doc. 13, Gaskins at 45-46; Doc. 14, Lang at 62-66).

Instead of offering evidence that they were replaced by younger workers, or statistical evidence that older workers were terminated at a disproportionate rate, Plaintiffs simply theorize that they were disciplined more harshly because of their age. They posit that the safety violations for which they were terminated were commonplace at the Blue Ash facility.  However, the fact that other employees may have committed similar infractions will not support an inference that "but for" Plaintiffs' age, they would not have been terminated, absent – at a minimum - evidence that the similarly situated employees were younger than 40.

The only employee that Plaintiffs point to in support of their theory is Brad Johnson, age 39 (Doc. 18 at 133), who was processing box production waste when he stuck his hand in the baler while it was moving.  Johnson, an hourly employee, attempted to hide his injury and tested positive for illegal drug use after the incident, but was only suspended for five days.  (Doc. 18, Yoder-Baert Depo. at 87-89). However, Yoder-Baert testified that the union contract did not permit termination for drug use until the second offense.  Johnson ultimately was terminated for a second positive drug screen.  (*Id.* at 80, 90-91).

Defendant persuasively argues that Johnson is not a similarly situated employee, because he was a union employee.  *See Ercegovich v. Goodyear Tire & Rubber Co.*,

154 F.3d 344, 352 (6th Cir. 1998); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)("defining similarly situated, including being "subject to the same standards…without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.").  Yoder-Baert testified that union employees were subject to a collective bargaining agreement, but that salaried non-union employees like the Plaintiffs were held to a "higher standard." (Doc. 18, Yoder-Baert at 89-90; *see also* Doc. 19, Doherty at 48-50).  Because the only employee that Plaintiffs allege committed a similar safety violation was a union member who was not similarly situated, Plaintiffs have failed to present any evidence from which an inference could be drawn that age was the "but-for" reason for their termination.  *See Davis v. Ineos ABS (USA) Corp.*, Case No. 09-773-JGW, 2011 WL 1114409 (S.D. Ohio Mar. 24, 2011)("[N]o discriminatory intent may be inferred from [and employer's] decision to treat differently union members and non-union members.").  In short Plaintiffs have failed to demonstrate a prima facie case of age discrimination, because no jury could reasonably find "circumstances that support an inference" that Plaintiffs would not have been terminated "but for" their age.

Notwithstanding this conclusion, the undersigned notes that Plaintiffs are right to dispute Defendant's suggestion that Plaintiffs could not have been discriminated against simply because two of the three decision makers were older than 40, with the third just under 40.  Although the Sixth Circuit continues to recognize the same actor inference, when the same person both hires and fires an employee over the age of 40,[5] the appellate court has rejected any inference that a decision maker who is a member the same protected group is less likely to discriminate.  *See Wexler v. White's Fine*

---

[5] Defendant does not argue that the same actor inference applies in this case.

10

*Furniture*, 317 F.3d 564, 574 (2003)(*en banc,* upholding as permissible the same actor inference, but rejecting the same group inference).

### b.  Prima Facie Case on Workers' Compensation Retaliation Claim

Distinct from his claim of age discrimination, Gaskins also claims that he was terminated in retaliation for filing a workers' compensation claim.  Ohio law prohibits terminating an employee for initiating or pursuing a workers' compensation claim.  O.R.C. §4123.90.  An employee may establish a prima facie workers' compensation retaliation case by demonstrating that he: (1) suffered a job-related injury; (2) filed a workers' compensation claim; (3) was terminated; and (4) that a causal connection exists between the two events.  *Young v. Stelter & Brinck, Ltd.*, 175 Ohio App.3d 221, 881 N.E.2d 874 (Ohio App. 1 Dist. 2007).  However, "an employee who files a workers' compensation claim is not insulated from discharge."  *Markham v. Earle M. Jorgensen Co.*, 138 Ohio App.3d 48, 492, 741 N.E.2d 618, 624 (Ohio App. 8 Dist. 2000).

Defendant argues that it is entitled to judgment as a matter of law on this claim because, as with his age discrimination claim, Plaintiff has failed to establish the causal connection element of his case.  The undersigned agrees.

Plaintiff was suspended the day after the accident, upon his return to work.  He was terminated a week later.  Thus, Plaintiff has demonstrated that he filed a workers' compensation claim and almost immediately suffered an adverse action.  However, at least one Ohio court has held that "temporal proximity alone does not show the required causal connection."  *Cunningham v. The Kroger Co.*, 2006 WL 3230323 at *3 (Ohio App. 1 Dist., Nov. 9, 2006)(granting summary judgment to employer that immediately suspended and then terminated employee for safety violation resulting in injury, citing *Pflanz v. Cincinnati*, 149 Ohio App.3d 743 (Ohio App 1 Dist. 2002)).  Instead, to

"establish a causal connection in this context, a plaintiff must 'present sufficient evidence to create an inference that the employment decision was retaliatory....'" *Wind v. Walgreen Co.*, Case No. 1:10-cv-94 (S.D. Ohio, June 22, 2011)(Barrett, J.).

Plaintiff contends that the temporal proximity presented should be deemed sufficient to show a causal connection. After all, it was Plaintiff Gaskin's first safety violation, and his immediate supervisor testified that the violation was not expressly prohibited by any written rule. (Doc. 18, Johnson Depo. at 71). Plaintiff argues that those facts and the fact that Defendant is self-insured are sufficient to establish at least an inference of a causal connection, and thereby survive summary judgment.

Extreme temporal proximity can – at least in some cases – be sufficient to raise and inference of causal connection. In the context of a claim of retaliatory discharge based upon the filing of a discrimination claim, the Sixth Circuit has held that temporal proximity between the events can be sufficient to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (finding temporal proximity alone to be sufficient when the defendant fired the plaintiff on the same day that it learned that the plaintiff had filed an EEOC complaint).

However, context is key. The undersigned is not convinced that even extreme temporal proximity is necessarily sufficient – standing alone - to prove a retaliatory workers' compensation claim, as opposed to a retaliatory Title VII claim. The two types of claims are fundamentally different as the facts of this case illustrate. As discussed in *Cunningham v. The Kroger Co.* and as illustrated herein, the violation of a workplace safety rule, by its nature, has the potential to result in a compensable workplace injury. Thus, a serious safety violation that results in a compensable workplace injury not

infrequently will provide grounds for discipline.  It is almost inconceivable that the filing of an EEOC complaint would be similarly linked with a violation of a workplace rule.  For that reason, very close temporal proximity between the filing of an EEOC complaint and termination may give rise to a reasonable inference concerning causation, but the same inference does not necessarily arise when an employee who commits a safety violation is terminated following a workplace accident.  Alternatively, and as discussed below, I conclude that even if a reviewing court found that the close temporal proximity is sufficient alone to establish Plaintiff's prima facie workers' compensation retaliation claim, it is not sufficient to establish pretext in the face of the legitimate reasons offered by Defendant for its disciplinary action.

Both parties cite to *Wind v. Walgreen Co.*, in which this court denied summary judgment to an employer on a workers' compensation retaliation claim.  However, the court in that case did not rely solely on temporal proximity to support the causal element, but referenced the plaintiff's history of multiple prior workers' compensation claims. Aside from that key factual distinction, the opinion in *Wind v. Walgreen* is unpublished, and its persuasive value is undermined by the parties' subsequent settlement.

Here, Defendant paid workers' compensation benefits to Gaskins. Plaintiff suggests that fact should not create any inference in Defendant's favor, because it is entirely possible that an employer would pay out benefits and still retaliate based on its fear of future claims.  That hypothesis was credited in *Wind v. Walgreen*, where the plaintiff had filed multiple prior claims.  Again, however, there is no similar factual support for such a hypothesis here.  In fact, Defendant saved no money by terminating Plaintiff since it remained obligated to pay his workers' compensation benefits, and did

13

so without dispute. RockTenn also has submitted evidence that many other employees who have filed workers' compensation claims have not been terminated. (Doc. 18, Yoder-Baert Depo., Exhibit 7).

Plaintiff challenges Defendant's exhibit as incomplete, because it does not contain information regarding the precise dates that workers' compensation claims were filed, or amounts of individual claims. However, Yoder-Baert testified that the Defendant budgets in excess of a million dollars to pay out annual workers' compensation claims at the Blue Ash facility alone. (*Id.* at 20). Given the lack of any opposing evidence that would give rise to a plausible inference of a causal connection between Gaskins's workers' compensation claim and his termination, Defendant is entitled to summary judgment.

### c. Prima Facie Case on ERISA Interference/Retaliation Claims

Defendant argues that it is also entitled to summary judgment on Lang's ERISA claims, which allege that the Defendant terminated Lang in violation of §510 of ERISA. The statute supports two types of claims: "(1) an 'exercise' or 'retaliation' claim….where 'adverse action is taken because a participant availed [him]self of an ERISA right'; and (2) an 'interference' claim where adverse action is taken as 'interference with the attainment of a right under ERISA.'" *Hamilton v. Starcom Mediavest Grp., Inc.*, 522 F.3d 623, 627-28 (6th Cir. 2008)(internal citations omitted); 29 U.S.C. §1140. To state either type of claim under §510, Plaintiff must show that Defendant had a "specific intent" to violate ERISA. *Id.*

### i. ERISA Interference Claim

Defendant disputes the notion that it "interfered" with Plaintiff's ERISA rights, and argues that Plaintiff has offered no evidence that his termination was causally related to

14

his ERISA rights.  Because Lang has no direct evidence to support his ERISA clams, he must prove his case through the same burden shifting approach applicable to his age discrimination claim.  *See Texas Dep't of County Affairs v. Burdine*, *supra.*

Plaintiff theorizes that he was terminated so that the Defendant could avoid the payment of future medical benefits, should his daughter receive the hoped-for double-lung transplant.  An ERISA interference claim can be based upon interference with future benefits  *See Pennington v. Western Atlas, Inc.*, 202 F.3d 902, 906 (6th Cir.), cert. denied, 531 U.S. 825 (2000).  However, the facts of *Pennington* are easily distinguished from those presented here.  In *Pennington*, the plaintiffs alleged interference with anticipated retirement benefits when they were fired a few years prior to retirement.  The *Pennington* plaintiffs offered clear evidence that their employer hand-picked which employees to terminate based upon their birth dates, dates of hire, and benefit program information.  *Id.*, at 908-909.  In fact, in making targeted decisions on who to terminate, the decision makers expressly stated "that they wanted to reduce salaries and medical costs and that they were not concerned about lawsuits."  *Id.* at 908.  Moreover, the plaintiffs' expert witness testified that "the pattern of terminations …was not age neutral because more people age 50 and over were terminated than would be expected in a random process."  *Id.*  Therefore, strong circumstantial evidence supported the conclusion that the *Pennington* employer based its termination decisions in part upon the employer's future liability for ERISA benefits.  In this case Lang has offered no similar evidence that would yield an inference of intentional interference. Instead, Lang's prior use of the Defendant's health insurance benefits was fully approved without question.

In support of his contention that the Defendant deliberately interfered with his

future benefits, Lang also relies upon *Huggard v. United Performance Metals, Inc.*, Case No. 1:10-cv-63 (Nov. 17, 2011)(R&R adopted by Dlott, J., on Jan 4, 2012), another unpublished (and later settled) case in which an employee lost future benefits upon his termination.  The facts of that case involved a sick plaintiff who was terminated a single day before he would have obtained substantial life insurance benefits.  *Id.* at *53.  The plaintiff later died from his terminal cancer.

Again, the facts presented here sharply contrast with those presented in *Huggard*.  In this case, neither the timing nor the fact of the hoped-for lung transplant was certain.  Lang was not terminated until September 2011, even though he alerted the company that his family might incur additional health care costs as early as October 2010, when he applied (and was approved for) FMLA leave.  Plaintiff reiterated his hope/anticipation in February 2011 that his daughter would receive her transplant in the summer of 2011.  Waiting for 11 months after being notified of the potential medical and/or FMLA leave expense, until a date that fell <u>after</u> the date that Plaintiff had anticipated the transplant would occur, does not give rise to a plausible inference that avoidance of those future benefits was the basis for the termination.  Using the date of February 2011, when Plaintiff reiterated his FMLA request but suggested a time frame of summer 2011, does not change the equation.  It defies logic to assume that Defendant would choose to wait seven more months – a date beyond the hoped-for transplant date - before deciding to terminate Plaintiff.  In addition, Plaintiff's right to COBRA coverage meant that Defendant remained potentially liable for the costs of the transplant long after his termination, and would benefit only so far as the company would not be required to pay its share of the premiums for coverage.   Plaintiff testified that he did, in fact, continue his benefits through COBRA.  (Doc. 14, Lang at 83).

16

As the Sixth Circuit explained in reference to a similar claim:

> A plaintiff does not state a prima facie case of § 510 interference if the plaintiff demonstrates "only that he lost the opportunity to accrue new benefits." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1113 (6th Cir.2001). Rather, a § 510 plaintiff must also establish that his employer "had the specific intent of avoiding ERISA liability when it discharged him. Otherwise, every employee discharged by a company with an ERISA plan would have a claim under § 510." *Id.; see Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 452 (6th Cir.1999) (affirming entry of summary judgment in favor of employer on § 510 claim, explaining that, "[g]iven that Plaintiff offered no proof that [his employer] encouraged him to resign or accepted his resignation in order to prevent him from making a claim for employee benefits, we hold that the district court properly determined that Plaintiff failed to present sufficient evidence to make a prima facie case under ERISA"); *Abbott v. Pipefitters Local Union No. 522 Hosp., Med., and Life Benefit Plan*, 94 F.3d 236, 242 (6th Cir.1996) ("[A] plaintiff under § 1140 must demonstrate that the action at issue was taken with the specific intent to violate ERISA, i.e., that a motivating factor in the defendant's action was the purpose of interfering with the plaintiff's entitlement to benefits."), *cert. denied*, 519 U.S. 1111, 117 S.Ct. 948, 136 L.Ed.2d 836 (1997). The Plaintiffs here have failed to produce any evidence from which a reasonable jury could infer that [their employer] terminated their employment in order to avoid having to provide the Plaintiffs with ERISA benefits.

*Bingaman v. Procter & Gamble Co.*, 04-3584, 2005 WL 1579703 (6th Cir. July 6, 2005) (affirming summary judgment). Likewise, Lang has failed to produce any evidence from which a reasonable jury could infer that Defendant terminated his employment in order to avoid providing Plaintiff with ERISA benefits.  Accordingly, Defendant is entitled to judgment on Plaintiff's ERISA interference claim.

### ii.    ERISA retaliation claim

For similar reasons, Lang has failed to prove the causal element of his ERISA retaliation claim.  To establish a prima facie case of retaliation, an employee must show that (1) he was engaged in activity that ERISA protects; (2) he suffered an adverse employment action; and (3) a causal link exists between his protected activity and the adverse action.  *Hamilton*, 522 F.3d at 628 (additional citation omitted).  Plaintiff argues

17

that the causal element of his ERISA retaliation claim might be inferred from the fact that Plaintiff's family previously received $1.5 million in health insurance benefits from Defendant, and that Defendant was aware of his daughter's need for a double-lung transplant in the future, which could cost (in Plaintiff's estimation) up to $2 million. However, there is no evidence that anyone at the Blue Ash facility, or even in the company's corporate benefits office, was actually aware that his family had previously received the lifetime maximum benefit of $1.5 million. (Doc. 14, Lang at 81-82; Doc. 24, Poole at 16). In fact, the record suggested that management was supportive of Lang's family issues, holding fundraisers on his behalf, and there is no evidence to suggest that any of the prior health care payments met with any resistance or negative feedback. Lang continued to work at the facility for 3 years, incurring presumably very high health insurance reimbursement costs throughout his tenure. Lang's theory that he was terminated in retaliation for having high health care costs in the past has no support in the record. In addition, despite Defendant's knowledge that Plaintiff's daughter was on a transplant list, there is no evidence that any decision-maker had considered or was aware of the estimated future cost of that transplant. The only estimate of the cost is from Plaintiff's own testimony; there is no evidence that he shared or discussed that information with anyone. Based on the failure of Plaintiff to produce any evidence on the causal element of his ERISA retaliation claim, Defendant also is entitled to summary judgment on that claim.

### d. Prima Facie Case on FMLA Interference and Retaliation Claims

The elements of an FMLA interference claim are similar to those under ERISA, requiring Plaintiff to show: (1) he was an eligible FMLA employee; (2) RockTenn was a covered employer; (3) Plaintiff was entitled to FMLA leave; and (4) Plaintiff gave notice

of his intention to take FMLA leave; and (5) Rock-Tenn denied Plaintiff the FMLA benefits to which he was entitled. *See Wysong v. Dow Chem Co.*, 503 F.3d at 441, 447 (6th Cir. 2007). However, unlike an ERISA interference claim, an employer's intent is irrelevant when an employee seeks redress for an FMLA interference claim - the only issue is whether the employee's substantive rights were violated. *Arban v. West Pub. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003).

The Defendant is entitled to judgment because it approved Plaintiff Lang's FMLA leave request. Lang never acted upon that request through September 16, 2011 when he was terminated, despite expressing his hope that his daughter would receive an organ transplant in the summer of 2011. An interference claim under the FMLA involves a straightforward inquiry into whether FMLA benefits to leave time or to reinstatement were denied. Plaintiff fails to cite any authority that would support his theory that an employer can be held liable on an FMLA "interference" claim when it has approved all benefits requested, based merely upon Plaintiff's belief that the employer might later rescind its approval of the requested leave, or carefully time his termination (months after approving the leave) prior to the use of the unscheduled and indeterminate leave. Sixth Circuit case law strongly favors the grant of judgment to the Defendant on Plaintiff's FMLA interference claim. *See Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012)(granting summary judgment where employer approved FMLA request in full, and did not shortchange the plaintiff's leave time or deny reinstatement); *Arban*, 345 F.3d at 401 ("The issue [under the interference theory] is simply whether the employer provided its employee the entitlements set forth in the FMLA—for example, a twelve week leave or reinstatement after taking a medical leave.") (citation and internal quotation marks omitted).

Plaintiff also has failed to prove the causal element of his FMLA retaliation claim. Plaintiff points only to modest circumstantial evidence to support that claim. Specifically, various managerial personnel, including his direct supervisor, Tom Johnson, Plant Manager Wilp, and Senior Benefits Analyst Kathy Moore all questioned him about his anticipated leave.  (Doc. 15, Wilp at 20; Doc. 14, Lang at 76-80).  Plaintiff testified that Johnson questioned him "weekly," that Wilp questioned him "monthly," and that Moore questioned him via email twice (in February 2011 and again in May 2011) after approving his request in October 2010.  However, Plaintiff concedes that, as Wilp testified, questions from supervisors and management were focused the timing of his anticipated leave, and motivated by the need to schedule other employees in his absence. (*Id.*).  No one ever made any negative comments about his request for leave. (*Id.*).  Thus, other than drawing an adverse inference from the fact that his supervisors periodically followed up with "the same questions" concerning when and whether he still planned to take the pre-approved leave, Plaintiff has no evidence at all to support his "feeling that the company was unhappy" about his planned absence.  (*Id.*).

Plaintiff's original October 2010 FMLA request was fully approved, and reconfirmed in February 2011.  Plaintiff was not terminated until September 2011, eleven months after his initial request and seven months after the February reiteration, thereby greatly reducing – if not wholly eliminating – any negative inference that closer temporal proximity might present.  Plaintiff also has failed to present any evidence to contradict or undermine evidence submitted by Defendant that other employees took FMLA leave and were not terminated.  (Doc. 18 at Exhibit 7).

Although Plaintiff cites case law suggesting that a time lag of up to six months can be sufficiently close to draw an inference on the causal connection element of a

retaliation claim, the temporal proximity was much closer in the Title VII cases on which Plaintiff relies than the seven or eleven month period at issue alleged here. *See, e.g., Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 563 (6th Cir. 2004)(Plaintiff terminated three months after filing EEOC claim); *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004)(Plaintiff terminated just 21 days after engaging in protected activity).

It is worth noting that in *University of Texas Southwestern Medical Center v. Nassar*, 133 S.Ct. 2517, 570 U.S. _____ (June 24, 2013), the Supreme Court recently tightened the standard for evaluating causation in workplace retaliation cases filed under Title VII. Prior to *Nassar*, Sixth Circuit case law supported a lesser "substantial or motivating factor" causation standard. *See, generally, e.g., Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542-543 (6th Cir. 2003). Citing the significant growth in retaliation claims over the past 15 years, *see id.,* 133 S. Ct. at 2531, the Supreme Court held that in order to prove such a claim under Title VII, a Plaintiff must prove that retaliation was the "but for" cause of the adverse action, rather than merely "a motivating factor" as is required for proof of a separate discrimination claim. While *Nassar* may not be directly applicable to Lang's FMLA or ERISA retaliation claims[6] or to Gaskins's workers' compensation retaliation claim, it lends context to, and undermines the relevance of, the Title VII cases on which both Plaintiffs most heavily rely.

Returning to Plaintiff's FMLA retaliation claim, the undersigned would not go so

---

[6]In *Pennington*, the court held that to prove an interference claim, a plaintiff need only show that interference was at least "a motivating factor" in the adverse employment decision. *Id.*, 202 F.3d at 909-911. *Pennington* relied upon Title VII case law. The issue of the correct standard to be applied to ERISA or workers' compensation retaliation claims has not been briefed. However, the undersigned concludes that Defendant is entitled to summary judgment even if the lower "motivating factor" standard remains the correct standard to be applied.

far as to hold that temporal proximity alone may *never* prove the causal element.  But even under pre-*Nassar* Sixth Circuit case law, temporal proximity was but one factor to consider and rarely held to be sufficient to prove causation, unless the events were extremely close in time.  *See Mickey v. Zeidler Tool & Die Co.*, 515 F.3d at 524-525. Here, the prior approval without question of Plaintiff's FMLA leave request in October 2010, the re-approval of the same request in February 2011, and the uncertainty that Plaintiff would ever actually take leave (borne out by the fact that he did not over an eleven month time period after first being approved), all contribute to the conclusion that Plaintiff has failed to prove the causal connection of his FMLA retaliation claim.

In addition to the evidence previously discussed, Defendant has offered unrebutted evidence that it did not terminate other employees who took FMLA leave. (Doc. 18, Yoder-Baert, Exhibit 7).  Plaintiff challenges that evidence on grounds that it fails to include Lang, and references many single days rather than extended leave periods.  However, Plaintiff's absence from the referenced exhibit is easily explained by the fact that Plaintiff never actually took FMLA leave, and Defendant represents the single days noted on the chart to be intermittent FMLA leave.  But Plaintiff has failed to establish his prima facie case even if this additional evidence were not considered, because he has put forward no evidence to support a plausible inference of a causal connection.

### 2.  Evidence of Pretext

The undersigned alternatively concludes that the Defendant would still be entitled to summary judgment based upon Plaintiffs' inability to show that Defendant's articulated reasons for the termination decisions were pretextual.  Under *McDonnell Douglas*, if an employer puts forth evidence of a legitimate, nondiscriminatory reason for

its action, the plaintiff must show that the reasons given were not the true reasons, but were instead a pretext for discrimination.  *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.*, 12 F.3d 1382, 1395 (6th Cir. 1993).  The "ultimate burden of proving…the intent to discriminate" remains with the plaintiff at all times. *Wright v. Murray Guard, Inc.,* 455 F.3d 702, 707 (6th Cir. 2006)(citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).  "A plaintiff can refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment action 'by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'"  *Wexler v. White's Fine Furniture*, 317 F.3d 564, 576-577 (6th Cir. 2003)(additional citation omitted).

Defendant has articulated a legitimate, nondiscriminatory reason for terminating both Plaintiffs – their respective safety violations.  Each of the two Plaintiffs argues that they have refuted the stated reason for their terminations by showing that it was a pretext either for age discrimination, or for their respective claims of ERISA and FMLA interference/retaliation or workers' compensation retaliation.

First, each Plaintiff argues that the proffered reason has no basis in fact. Plaintiffs argue that their actions were not specifically prohibited by any written safety rule.  Johnson testified that Lang's conduct was prohibited by a specific rule, but that Gaskins's conduct was not. (Doc. 18, Johnson at 71-72).  By contrast, Doherty testified that Gaskins's actions were prohibited by the "policy of positive control lockout tagout." (Doc. 19, Doherty at 42-44).  In any event, Plaintiffs offer no support for their premise that they could be terminated only if they violated a specific written rule stating: "do not climb on the forks of a forklift when lifted off the ground," or "do not attempt to climb into a truck with poor footing and limited space unless using a ladder and at the dock."  The

23

decision makers testified consistently that Plaintiffs' actions constituted safety violations. Plaintiffs do not deny having committed those acts; therefore, Plaintiffs have not demonstrated that the Defendant's reliance on their alleged violations had no basis in fact.

Plaintiffs additionally argue that the cited safety violations did not actually motivate their terminations, or were insufficient to motivate their terminations. Plaintiffs allege that the exact same safety violations were often committed by other employees, including Plaintiffs' supervisors. Plaintiffs contend that they engaged in the same conduct on prior occasions without having been reprimanded or counseled. Lang testified that other employees climbed on to the forks, that supervisors saw him previously engaged in the same behavior but did not discipline him, and that direct supervisors themselves had engaged in the same conduct. (Doc. 14, Lang at 37-39, 49-52, 55). Gaskins testified similarly that other employees would frequently – at least weekly- climb onto the forks of forklift, or would climb into a truck, in order to double-check the accuracy of what was recorded to be in a loaded truck. (Doc. 13, Gaskins at 26-30). However, neither Plaintiff asserts that any of the three decision makers had observed or engaged in climbing onto a forklift in that manner. In addition, the decision makers testified that they had not witnessed behavior similar to Lang's conduct in recent years, given the emphasis on safety. (Doc. 15 (Wilp) at 33-35; Doc. 20 (Birchfield) at 32-33).

Lang points out that the unionized forklift operator who assisted him by moving the forklift was not disciplined. However, that employee was not similarly situated because he was a union employee who complied with Lang's request to move the

forklift.  Although Plaintiff protests that a union employee should be viewed as an equal to him, the undersigned disagrees, for the reasons discussed above.

Lang additionally argues that Wilp's actions at the time of the incident lends credence to Plaintiff's position that the safety violation was insufficient for termination. When Wilp witnessed the incident, he did not terminate Plaintiff on the spot, but instead allegedly told him that it would have been better to put a pallet on the forks first instead of standing on them directly.[7]  (Doc. 14, Lang at 54-57; *contrast* Doc. 15, Wilp at 23-29). Doherty had no explanation for why Wilp did not discipline Plaintiff on the spot, despite testifying that the safety violation was "egregious."   (Doc. 19, Doherty at 36-37). However, Wilp testified that he had no authority to fire an employee, and wanted to talk to other managers first.  (Doc. 15, Wilp at 29-31).  Lang was suspended the very next day, in a meeting with Doherty and Birchfield.  (Doc. 20, Birchfield at 14, 18; Doc. 15, Wilp at 28; Doc. 14, Lang at 56-58).

The fact that Lang was not severely disciplined until the next day is not sufficient to show pretext.  Defendant waited a minimal amount of time to convene a meeting with managerial personnel before suspending Plaintiff pending further investigation.  Plaintiff has offered no evidence that anything occurred during the short delay between the violation and the disciplinary action that would support a claim that the stated reason was a pretext for age discrimination, or for ERISA or FMLA interference or retaliation.

For similar reasons, Plaintiff's argument that the Defendant failed to conduct any real investigation prior to terminating him a week later is insufficient to show pretext. Given that Plaintiff admitted to climbing on the forklift in the manner described, it is

---

[7]Wilp strongly disputes having given that advice, but the dispute is resolved in favor of Plaintiff at this stage of the proceedings.

unclear what additional "investigation" the Defendant should have conducted.  Plaintiff complains that the only investigation that occurred was discussion among the managers about Lang's conduct.  (Doc. 20, Birchfield at 54).  But discussion of the safety violation suggests an absence of pretext, rather than support for Plaintiff's theory.  There is no evidence to suggest that a decision maker's knowledge that Lang might someday avail himself of future FMLA leave or health insurance benefits, or that Lang's advancing age, played any role in the termination decision.

For similar reasons, Gaskins fails to prove pretext.  Like Plaintiff Lang, Plaintiff Gaskins relies on testimony that other employees committed similar violations, but were not terminated, to support his argument that Defendant's stated reason for termination was a pretext for age discrimination or for workers' compensation retaliation.  Again, however, there is no evidence that any of the three decisionmakers were aware of any other employee committing a similar violation.  Gaskins makes much of the fact that Wilp himself testified that he had engaged in similar conduct. (Doc. 15, Wilp at 33-34). However, Wilp's testimony was that he had climbed onto the back of a trailer to check a load a decade earlier.  Wilp explained significant differences (the larger amount of space in the truck, and the focus on safety) between his conduct a decade earlier and the violation that led to Gaskins's fall and injury.  Gaskins offers no evidence of any other similarly situated person having committed a similar infraction in recent years.

Gaskins was immediately taken to the hospital for treatment of his fractured arm. Upon his return the next day, he was suspended.  Plaintiff complains that Doherty first told him that after he served his suspension, the "company would put it behind us and move forward.")(Doc. 13, Gaskins at 39; Doc. 19, Doherty at 39-40).  Absent any

evidence at all that Doherty changed his mind due to some improper motive, however, Doherty's initial statement does not support a finding of pretext.

A plaintiff's "feeling" that retaliation or discrimination is the cause is insufficient to show pretext; the plaintiff must offer evidence that the adverse action was actually in retaliation for specific protected conduct.  *See Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304 (6th Cir. 1989)(a vague charge of discrimination in an internal memorandum is insufficient to constitute opposition to an unlawful employment practice).  Even if close temporal proximity between events could give rise to an inference of causation concerning either Plaintiff's prima facie case, neither Plaintiff has shown pretext.  *Seeger v. Cincinnati Bell Telephone Co.*, 681 F.3d at 285 ("Unlike its role in establishing a prima facie case, 'the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext.'")(citation omitted).

### III.  Conclusion and Order

For the reasons discussed above, **IT IS RECOMMENDED THAT** the Defendant's Motion for Summary Judgment (Doc. 21) be **GRANTED,** that judgment be entered in favor of the Defendant, and that this case be closed.

*s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

KEN GASKINS, et al.,                                              Case No. 1:12-cv-192

       Plaintiffs,                                        Dlott, J.
                                                                  Bowman, M.J.

    v.

ROCKTENN COMPANY,

       Defendant.


**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

28